UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

CARGO LOGISTICS INTERNATIONAL, LLC,

                         Plaintiff,           **MEMORANDUM & ORDER**
                                        20-CV-2130 (MKB)

     v.

OVERSEAS MOVING SPECIALISTS, INC.,

                         Defendant.
-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Cargo Logistics International, LLC ("Cargo Logistics") commenced the above-captioned action on May 11, 2020, against Defendants Overseas Moving Specialists, Inc. ("Overseas Moving") and its owner, president, and chief executive, Boaz Aviani, alleging breach of maritime contract, negligent misrepresentation, and fraud.[1]  (Compl., Docket Entry No. 1; Am. Compl., Docket Entry No. 14.)  Plaintiff alleges that Overseas Moving hired it to ship cargo to Ashdod, Israel, but failed to timely inform Plaintiff that the shipper had gone out of business and was unreachable, and ultimately, when the consignee, Tevel Logistics, Ltd. ("Tevel") failed to take delivery of the cargo, Defendants refused to declare the cargo abandoned for over a year and refused to pay the associated fees, (Am. Compl. ¶¶ 14–30, 37–45), resulting in Plaintiff's temporary loss of shipping privileges with nonparty Zim Shipping Line ("Zim"), (*id.* ¶¶ 31–36).[2]

---

[1]  The Court granted Defendants' motion to dismiss all claims as to Boaz Aviani and Plaintiff's negligent misrepresentation and bill of lading fraud claims against Overseas Moving in its Memorandum and Order dated August 30, 2021 ("August 2021 Decision").  (Mem. & Order dated Aug. 30, 2021 ("Aug. 2021 Decision"), Docket Entry No. 24.)

[2]  Plaintiff invokes the Court's admiralty jurisdiction, 28 U.S.C. § 1333, as the sole basis for subject matter jurisdiction. (Am. Compl. ¶ 4.)

Defendant moves (1) to exclude the testimony of Plaintiff's proposed experts, Kerri Kemp and Chad Rundle, pursuant to Rule 26 of the Federal Rules of Civil Procedure and Rule 702 of the Federal Rules of Evidence, and (2) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiff's fraud and breach of contract claims, as well as Plaintiff's claim for consequential damages resulting from its alleged lost profits.[3]  For the reasons set forth below, the Court denies Defendant's motion to exclude the expert testimony of Kemp and Rundle, and denies Defendant's motion for summary judgment.

## I.   Background

The following facts are undisputed unless otherwise noted.[4]

### a.   Factual background

Plaintiff is a non-vessel-owning common carrier ("NVOCC"), that books space with vessel-owning carriers to ship items overseas.  (Def.'s 56.1 ¶ 11.)  Plaintiff assumes responsibility for shipments under bills of lading that it issues.  (*Id.* ¶ 13.)  Defendant is also an NVOCC.  (*Id.* ¶ 14.)  On June 30, 2017, Defendant booked a shipment of cargo with Plaintiff to be shipped from New York to Ashdod, Israel, for consignment to Tevel.  (*Id.* ¶ 15.)

#### i.   Bill of lading

Plaintiff shipped the cargo on a ship operated by Zim pursuant to a bill of lading dated July 22, 2017.  (*Id.* ¶ 17.)  The bill of lading described the goods to be shipped and states in

---

[3]  (Def.'s Mot. for Summ. J. ("Def.'s Mot."), Docket Entry No. 47; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 47-1; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 48; Pl.'s Mem. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), Docket Entry No. 49.)

[4]  (Def.'s Stmt. of Material Facts ("Def.'s 56.1"), Docket Entry No. 47-2; Pl.'s Stmt. of Genuine Disputes ("Pl.'s 56.1"), Docket Entry No. 49-1.)

relevant part that Defendant "shall indemnify [Plaintiff] against all loss, damage, expenses, liability, penalties and fines arising or resulting from inaccuracy of any description or particular." (*Id.* ¶ 21; Bill of Lading 2, annexed to Am. Compl. as Ex. G, Docket Entry No. 14-7.)  The bill of lading also provides information about indemnification and states in relevant part:

> (Freight and Charges) . . . (F) [Defendant] shall be liable for and shall indemnify [Plaintiff] against: (1) all dues, duties, taxes, consular fees, and other charges levied on the [g]oods, and (2) all fines, damages and losses sustained by the [Plaintiff] in connection with [g]oods, howsoever caused, including [Defendant's] failure to comply with laws and regulations of any public authority in connection with the [g]oods, or failure to procure consular, Board of Health, or other certificates to accompany the [g]oods. . . . (H) The shipper, consignor, consignee, owner of the [g]oods and holder of this [b]ill of [l]ading shall be jointly and severally liable to [Plaintiff] for the payment of all freight and charges and for the performance of the obligations of any of them under this [b]ill of [l]ading.

(Bill of Lading 2; Pl.'s 56.1 ¶ 22.)  The bill of lading also provides that "[i]f the [g]oods are unclaimed during a reasonable time . . . [Plaintiff] (without responsibility to it) may at its discretion and subject to its lien, sell, abandon, or otherwise dispose of such [g]oods at the sole risk and expense of [Defendant]."  (Bill of Lading 2.)

Plaintiff's published tariff ("Tariff"), under which it shipped the cargo, similarly states that if goods are unclaimed "during a reasonable time," Plaintiff "may at its discretion and subject to its lien sell, abandon, or otherwise dispose of" the goods "at the sole risk and expense of" Defendant.  (Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 24; Tariff ¶¶ 23, 24, annexed to Decl. of Kevin J. O'Connor ("O'Connor Decl.") as Ex. I, Docket Entry No. 47-12.)  The Tariff also provides that:

> Any and all charges [related to unaccepted or unclaimed freight] that are incurred are the responsibility of booking party which includes any and all charges related to abandonment including but not limited to: Demurrage, storage, port or forwarding charges plus a 15% admin fee and a $750.00 USD abandonment surcharge per container.

> All charges will be presented in the form of an abandonment invoice to the booking party (Shipper) and this abandonment invoice is payable immediately.
>
> If abandonment invoice is not paid within 5 business days of receipt then a 33% surcharge will be added.
>
> If legal representation must be consulted or retained for collection of these funds or any other need surrounding abandonment of cargo, booking party will be liable for all legal fees plus 15% legal admin fee.

(Tariff 1; Def.'s 56.1 ¶ 25.)

### ii.    Arrival in Ashdod

The cargo arrived in Ashdod on August 16, 2017.  (Def.'s 56.1 ¶ 28.)  The shipper went out of business soon after the cargo arrived in Israel.  (Pl.'s 56.1 ¶¶ 30–31.)

Plaintiff states that Defendant "repeatedly misrepresented" until November of 2017 that the cargo was not abandoned but was instead being cleared through customs, and that paperwork was being gathered for the same, despite Defendant and Tevel being unable to contact the cargo owner.[5]  (Pl.'s 56.1 ¶¶ 30–31, 36.)  On October 19, 2017, in a letter to Defendant, Tevel stated that it would not "assume any responsibility for this shipment" and stated that the shipment "does not belong" to it and asked that Defendant contact the shipper and have them change the bill of lading to correct the consignee to the actual owner.  (Pl.'s 56.1 ¶ 38; Exs. to Dep. of Boaz Aviani ("Aviani Dep. Exs.") 70, annexed to Decl. of Seth Nichamoff ("Nichamoff Decl.") as Ex.

---

[5]  Defendant disputes this claim, and asserts that upon arrival, the shipper had difficulties getting the cargo released from customs, which was driven by the shipper's lack of an import license for certain medical equipment contained in the shipment itself, and government officials would not issue the license.  (Def.'s 56.1 ¶¶ 30–31.)

A, Docket Entry No. 49-3.)[6]  On November 20, 2017, Zim, the owner of the container used to ship the cargo, informed Plaintiff that it would hold Plaintiff responsible for all applicable fees associated with the abandonment, and Zim charged Plaintiff demurrage fees.  (Def.'s 56.1 ¶¶ 41, 43.)  Defendant asked Plaintiff to provide an invoice showing the amount Plaintiff had paid to Zim, and refused to pay for the destruction of the cargo, demurrage, or storage without proof of Plaintiff's actual payment of the fees to Zim.  (Pl.'s 56.1 ¶¶ 44–45.)

Plaintiff asserts that Zim required a signed letter of abandonment ("LOA") from Defendant to destroy the goods.[7]  (Pl.'s 56.1 ¶¶ 48–50, 53, 62.)  In November of 2017, Zim provided Plaintiff with a draft LOA.  (Def.'s 56.1 ¶ 47; Draft Letter of Abandonment ("Draft LOA"), annexed to O'Connor Decl. as Ex. K, Docket Entry No. 47-14.)

Plaintiff asserts that Zim began refusing to carry Plaintiff's cargos starting in November of 2017 and Plaintiff could not book cargos with Zim starting in January of 2018.[8]  (Pl.'s 56.1 ¶¶ 73, 76.)  On January 30, 2018, Plaintiff informed Defendants that Zim was refusing to accept any further shipments from Plaintiff until Plaintiff returned Zim's container free of Defendant's cargo.  (Def.'s 56.1 ¶ 71.)  Plaintiff contends that because it could not book cargos with Zim, it lost $250,000 in profits because it could not offer competitive rates on cargo shipped from the United States to the Mediterranean.  (*Id.* ¶ 72.)

---

[6]  Because the internal pagination for Exhibit A to the Nichamoff Decl. is inconsistent, the Court refers to the page numbers assigned by the electronic case filing system.

[7]  Defendant disputes this claim, asserting that Zim "never once asked [Defendant] to sign an LOA," (Def.'s 56.1 ¶ 48), and that Zim instead requested that Plaintiff sign the LOA, (*id.* ¶¶ 47, 51).

[8]  Defendant disputes this claim, and asserts that Plaintiff "has furnished no actual evidence that it was prevented from shipping with Zim."  (Def.'s 56.1 ¶ 73.)

On May 3, 2019, Defendant signed an LOA, after which Plaintiff destroyed the cargo and returned the container to Zim.  (*Id.* ¶¶ 64–65.)  The total fees charged in Zim's invoice was $165,400, but Zim and Plaintiff later negotiated down the sum to $25,000.  (Pl.'s 56.1 ¶¶ 68, 70.)  In August of 2019, Zim again began carrying Plaintiff's cargo.  (Def.'s 56.1 ¶ 66.)  Plaintiff contends that from the initial abandonment of the cargo through its disposal, it incurred $165,140 in costs, which Defendant has refused to pay.  (Am. Compl. ¶¶ 43–45.)

### a.   Procedural history

Plaintiff commenced the above-captioned action against Defendants Overseas Moving and Aviani on May 11, 2020, alleging breach of maritime contract, negligent misrepresentation, and fraud.  (Compl., Docket Entry No. 1; Am. Compl., Docket Entry No. 14.)  Plaintiff claims that Overseas Moving is liable for the $165,140.00 in incurred costs, as well as $250,000.00 in lost profits from the period during which it could not ship cargo with Zim and interest, attorneys' fees, court costs and legal administration fees.  (Am. Compl. ¶ 45.)

Defendants moved to dismiss all claims against Aviani, the negligent misrepresentation and fraud claims against Overseas Moving, and all claims for lost profits.  (Mot. to Dismiss, Docket Entry No. 19.)  The Court granted Defendants' motion to dismiss all claims as to Aviani and Plaintiff's negligent misrepresentation and bill of lading fraud claims against Overseas Moving, and denied Defendants' motion as to the fraud claim based on Overseas Moving's statements after the cargo arrived in Ashdod.  (Aug. 2021 Decision 31.)  The Court also concluded that Plaintiff could pursue consequential damages in the form of lost profits.  (*Id.*)

On July 25, 2023, after discovery concluded, Defendant moved for summary judgment as to Plaintiff's remaining claims, and in the alternative to exclude Plaintiff's proposed expert testimony from Kemp and Rundle.  (Def.'s Mot. 1.)  Plaintiff opposes the motion.  (Pl.'s Opp'n.)

6

## II.  Discussion

### a.  Standards of review

#### i.  Rule 702

"The admission of expert testimony is governed primarily by the Federal Rules of Evidence." *United States v. Walker*, No. 18-3506, 2023 WL 3451419, at *1 (2d Cir. May 15, 2023).  Rule 702 of the Federal Rules of Evidence was recently amended, and this new Amendment took effect December 1, 2023.  The rule now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[9]  "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . .

---

[9] Prior to the Amendment, Rule 702 read:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011) (amended 2023).  Although the language remains largely similar, the Court is mindful of the purposes of the two amendments, as set forth in the advisory committee's notes.

The purpose of the first amendment was to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R.

the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) ("The proponent of expert testimony bears the burden of establishing admissibility, with the district court serving a gatekeeping role to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Williams*, 506 F.3d at 160)); *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citations omitted)).

Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *see also United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the district court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (quoting same).  In *Daubert*,

---

Evid. 702 advisory committee's note to 2023 amendment.  The amendment was aimed at courts that had erroneously held that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.* Rather, the Rule 104(a) preponderance standard is to be applied before a court admits the expert opinion in the first place.  *See id.*  The second amendment served to "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*

the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that

bear on the determination of reliability:

> (1) whether a theory or technique has been or can be tested;
> (2) "whether the theory or technique has been subjected to peer
> review and publication;" (3) the technique's "known or potential
> rate of error" and "the existence and maintenance of standards
> controlling the technique's operation;" and (4) whether a particular
> technique or theory has gained general acceptance in the relevant
> scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v.*

*Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (quoting same); *Zaremba v. Gen. Motors Corp.*, 360

F.3d 355, 358 (2d Cir. 2004) (similar) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–

50 (1999)).  The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a

definitive checklist or test," and thus, the *Daubert* factors "neither necessarily nor exclusively

appl[y] to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 150 (citation and internal

quotation marks omitted).

The district court is afforded "the same broad latitude when it decides how to determine

reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142

(emphasis omitted) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).  Expert

testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (quoting same).  When an

expert's opinion is based on data or methodologies "that are simply inadequate to support the

conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion

testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (quoting

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also Nimely*,

414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district

court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec.*, 522 U.S. at 146)). Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267); *see also Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

> ### ii.   Rule 56

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.*  The

court's function is to decide whether, "after resolving all ambiguities and drawing all inferences

in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v.*

*N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing

*Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127,

129 (2d Cir. 2013)).

### b. Admissibility of expert testimony

Defendant moves to preclude Kerri Kemp and Chad Rundle from testifying as experts,

and also argues that their opinions are inadmissible for summary judgment purposes.  (Def.'s

Mem. 17–23.)  In support, Defendant argues that the Court should not consider Kemp's or

Rundle's opinions because (1) Plaintiff did not timely provide proper expert disclosures and a

complete report, (*id.* at 19), (2) Rule 702 precludes their opinions as they are merely factual

summaries being presented under the guise of expert reports, (*id.* at 20–22), and (3) Kemp and

Rundle, as Plaintiff's COO and sole owner, respectively, have a financial interest in the outcome

of the case and therefore cannot be allowed to testify as experts, (*id.* at 22–23).

Plaintiff argues that Kemp and Rundle are qualified experts and their testimony should be

allowed because (1) their education, work history, and first-hand knowledge about the subject

cargo qualify them as experts under Rule 702(a), (Pl.'s Opp'n at 10–11), (2) Defendant admitted

in correspondence with the Court and at deposition that it received Plaintiff's expert damages

report, but regardless Rundle and Kemp were non-retained testifying experts, and therefore did

not need to submit an expert report, (*id.* at 11–12), (3) Defendant has not identified what

opinions or testimony it seeks to strike, and therefore has not provided Plaintiff with fair notice

of what is objectionable or should be excluded, (*id.* at 12), and (4) Kemp is not an owner of

Plaintiff, and regardless, owners or employees of a company are not excludable as experts merely because that person is an owner or employee, (*id.* at 12).

### i. Rule 26 requirements

Under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, an expert witness must provide a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." *See also Caruso v. Bon Secours Charity Health Sys., Inc.*, 703 F. App'x 31, 33 (2d Cir. 2017) ("If [an] expert has been 'retained or specially employed to provide expert testimony in the case,' the party's disclosure 'must be accompanied by a written report.'" (quoting Fed. R. Civ. P. 26(a)(2)(B))); *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 n.13 (2d Cir. 2004) (same); *King v. Wang*, No. 14-CV-7694, 2021 WL 5232454, at *18 (S.D.N.Y. Nov. 9, 2021) (same). If the expert is not retained pursuant to Rule 26(a)(2)(B), however, the disclosure must state only (1) "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705"; and (2) "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C); *see also Champagne v. Columbia Dental PC*, No. 22-911, 2023 WL 6053001, at *1 (2d Cir. Sept. 18, 2023) ("Rule 26(a)(2)(C) provides that if an expert witness is not required to provide a written report under Rule 26(a)(2)(B), then the party offering the witness's testimony shall provide a disclosure that must include the 'subject matter on which the witness is expected to present evidence' and a 'summary of the facts and opinions to which the witness is expected to testify.'" (citation omitted)); *King*, 2021 WL 5232454, at *17 (same); *Michel v. Yale Univ.*, No. 20-CV-1080, 2022 WL 6493546, at *2–3 (D. Conn. Mar. 30, 2022) (same). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Caruso*, 703 F. App'x at 33 (quoting Fed. R. Civ. P. 37(c)(1)); *Kemp v. Target Corp.*, No. 20-CV-3, 2023 WL 4408901, at *3 (W.D.N.Y. May 22, 2023) (same).

## 1. Plaintiff was not required to provide written expert reports

Defendants do not argue that Kemp and Rundle were "retained or specially employed to provide expert testimony in [this] case," Fed. R. Civ. P. 26(a)(2)(B), and therefore no written expert report was required for either witness. *See, e.g.*, *Bank of China*, 359 F.3d at 182 n.13 ("Where the witness is not specially retained or employed to give expert testimony, or does not regularly give expert testimony in his or her capacity as an employee, no expert report is required."); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-CV-598, 2022 WL 2643583, at *3 (N.D.N.Y. July 8, 2022) (finding that the witness was governed by the Rule 26(a)(2)(C) standard because she "was not 'specially employed' to provide expert testimony in th[e] case" but rather "ha[d] been employed by [the defendant] full-time . . . and there [was] no indication that her duties as a[n] . . . employee 'regularly involve[d] giving expert testimony'" (quoting Fed. R. Civ. P. 26(a)(2)(B)); *King*, 2021 WL 5232454, at *18 (finding that the expert witness "fit[] comfortably within the category of an expert witness who is not retained or specially employed" where "he had personal involvement with the events giving rise to the litigation" and "[h]is involvement did not begin after litigation was commenced and he was not recruited by [d]efendants"); *Barack v. Am. Honda Motor Co., Inc.*, 293 F.R.D. 106, 108 (D. Conn. 2013) (concluding that no written expert report was required for the party's treating physician because "treating physicians are not 'retained or specially employed to provide expert testimony in the case'" (quoting Fed. R. Civ. P. 26(a)(2)(B)).

## 2.    Plaintiff complied with Rule 26(a)(2)(C)

Plaintiff was required to provide information (1) about "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705"; and (2) "a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).  The summary provided for Kemp's and Rundle's proposed testimony asserts that the witnesses' opinion testimony would include "that . . . [Defendant] is obligated to pay [Plaintiff] the sum of $165,140.00, together with interest[ and] attorneys' fees," and "that, as a result of [Defendant's] conduct and refusal to resolve the Cargo dispute, [Plaintiff] sustained damages and losses in the form of consequential damages consisting of lost profits approximating $250,000.00" based on Plaintiff's inability to ship international cargo with Zim. (Pl.'s Rule 26 Disc. 8, annexed to Nichamoff Decl. as Ex. H, Docket Entry No. 49-10.) Regarding the summary of the facts to which the witness is expected to testify, the disclosure states that the witnesses have "personal knowledge" of certain facts of the case, namely "the booking, transportation and disposal of the cargo made the subject of this dispute," as well as communications between Plaintiff, Defendant, and other individuals and authorities.  (*Id.*) Plaintiff has thus met its requirements under Rule 26(a)(2)(C).  *Cf. Olutosin v. Gunsett*, No. 14-CV-685, 2019 WL 5616889, at *3 (S.D.N.Y. Oct. 31, 2019) (concluding that the disclosure provided insufficient detail where defendants "summarized no facts at all").

### ii.    Kemp's and Rundle's testimony is not excludable because they are member and employee of the Plaintiff company

The status of Kemp and Rundle as member and employee of the LLC, respectively, does not preclude them from testifying as expert witnesses under Rule 702.  *See, e.g.*, Fed. R. Civ. P. 26(a) Adv. Comm. Notes (2010) ("A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence

Rule 702, 703 or 705.  Frequent examples include . . . employees of a party who do not regularly provide expert testimony."); *D'Attore v. Salmon*, 572 F. App'x 17, 18 n.1 (2d Cir. 2014) ("Frequent examples [of Rule 26(a)(2)(C) witnesses] include . . . employees of a party who do not regularly provide expert testimony." (emphasis omitted) (quotation omitted)); *Bank of China*, 359 F.3d at 182 n.13 (noting that the testimony of an employee "may have been admissible pursuant to Rule 702" if plaintiff had disclosed the employee as an expert witness); *AngioDynamics*, 2022 WL 2643583, at *3 (admitting expert testimony of defendant's employee); *Benn v. Metro-North Commuter R.R. Co.*, No. 18-CV-737, 2019 WL 6467348, at *5 (D. Conn. Dec. 2, 2019).  Kemp's and Rundle's testimonies are therefore not excludable on this basis.[10]

---

[10]  Defendant also argues that Kemp's and Rundle's testimonies should be excluded because they (1) "merely narrate facts gleaned from documents," (Def.'s Mem. 20), (2) opine on the ultimate legal conclusions at issue, (*id.* at 19–20 (citing *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom ScentSational Techs. LLC v. PepsiCo., Inc.*, 773 F. App'x 607 (Fed. Cir. 2019), and noting that in that case "the [c]ourt found a proposed expert's opinion as to whether a particular technology was a trade secret under the law to be inadmissible")), and (3) are "vague and unsubstantiated," (*id.* at 17, 20–21).  To the extent Defendant argues that Kemp and Rundle "merely narrate facts gleaned from documents," (*id.* at 20), Plaintiff's Rule 26 disclosure states that Kemp and Rundle have "personal knowledge" of the factual information summarized in the disclosure, (Pl.'s Rule 26 Disc. 8), and Defendant has failed to point to any specific aspects of the testimonies that draw factual conclusions not within Kemp's or Rundle's personal knowledge, (Def.'s Mem. 20–22).  In addition, although "[a]s a general rule an expert's testimony on issues of law is inadmissible," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) ("In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony [that] states a legal conclusion." (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994))), Defendant has similarly failed to identify any portions of Kemp's or Rundle's proposed testimonies that go to the "ultimate issue of the case," (Def.'s Mem. 19–20).  Finally, Defendant also asserts that the described expert opinion testimonies from Kemp and Rundle are "vague and unsubstantiated." (*Id.* at 17, 20–21.)  Defendant fails to point to what aspects of the proposed testimonies are "vague and unsubstantiated" and this argument is undermined by the fact that Plaintiff provided the underlying financial information used to establish the witnesses' opinion testimony, including calculations for the alleged lost profits and Plaintiff's tax returns.  (Pl.'s 56.1 ¶¶ 88–89; Rundle Damages Calculations, annexed to O'Connor Decl. as Ex. O, Docket Entry No. 47-18.)

### c.   Fraud claim

Defendant argues that Plaintiff's fraud claim should be dismissed because (1) it is duplicative of Plaintiff's breach of contract claim, (2) Plaintiff has not established Defendant's fraudulent intent, and (3) Plaintiff cannot show proximate cause.  (Def's Mem. 3.)  Defendant argues that Plaintiff's fraud claim is duplicative of its breach of contract claim because there is no evidence that Defendant made any promises outside of its obligations under the contract and there are no allegations that Plaintiff sustained damages not recoverable from its breach of contract action.  (*Id.* at 3–5.)  Defendant also asserts that there is no evidence that Defendant had the requisite intent to defraud, because there are no allegations, nor has discovery shown, that there was a benefit Defendant could have gained from the conduct alleged in the First Amended Complaint.  (*Id.* at 5–7.)  Finally, Defendant argues that Plaintiff cannot show proximate cause existed between Defendant's alleged misstatements and Plaintiff's alleged damages because discovery has shown that Zim only asked Plaintiff to sign an abandonment letter, but Plaintiff instead created a new abandonment letter and made additional demands that Defendant was under no obligation to perform.  (*Id.* at 8–9.)

Plaintiff argues that its fraud claim is not duplicative because there is evidence that Defendant knew shortly after the cargo arrived in Israel that the cargo owner was out of business and could not be contacted, and that Defendant should have at that time told Plaintiff that the cargo was abandoned but instead repeatedly made false representations that the cargo was not abandoned.  (Pl.'s Opp'n 3–4.)  Plaintiff argues that the representations at issue were made after the contract was formed and therefore establish a distinct claim.  (*Id.* at 4.)  Plaintiff also argues that evidence of Defendant's "own corporate knowledge that cargo owner was out of business and could not be found" creates a genuine dispute as to whether Defendant had the requisite

intent to defraud.  (*Id.* at 5.)  Finally, Plaintiff argues that there is a genuine dispute of material fact as to whether Defendant proximately caused the alleged damages, because Defendant's consistent misrepresentations and refusal to provide a letter of abandonment caused the damages to accrue.  (*Id.* at 6–7.)

"Under New York law, the essential elements of a fraud claim include 'representation of a material existing fact, falsity, scienter, deception, and injury.'"  *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)); *see also Cortes v. 21st Century Fox Am., Inc.*, 751 F. App'x 69, 72 (2d Cir. 2018) (stating the elements of a fraudulent misrepresentation claim).  Specifically, "[t]o state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Housey v. Proctor & Gamble Co.*, No. 22-888, 2022 WL 17844403, at *1 n.1 (2d Cir. Dec. 22, 2022) (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015)); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (same); *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 333 (S.D.N.Y. 2009) ("The second element of fraud in New York is intent to defraud, or scienter, which includes knowledge of the falsity of the representation." (citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995))).

"At the summary judgment stage, a plaintiff must offer enough evidence to allow a reasonable jury to find by clear and convincing evidence that each of the elements is met."  *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 259–60 (citing *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007)); *see also Crigger v. Fahnestock & Co.*, 443 F.3d

230, 234 (2d Cir. 2006) ("[T]he five elements of a fraud claim must be shown by clear and convincing evidence.").  "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 260 (quoting *Seon v. N.Y. State Dep't of Motor Vehicles*, 74 N.Y.S.3d 20, 25 (2018)).

In interpreting New York law, the Second Circuit has held that to maintain a claim for fraud separate from a breach of contract claim that an individual did not intend to perform its obligations under a contract, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted); *see also Reddy v. Mangino*, No. 08-CV-4805, 2010 WL 2771836, at *2 (E.D.N.Y. July 13, 2010) (holding that the plaintiff's fraud claim based on "alleged intention not to perform [an] obligation under their agreement" was duplicative of the breach of contract claim); *Cougar Audio, Inc. v. Reich*, No. 99-CV-4498, 2000 WL 420546, at *6 n.4 (S.D.N.Y. Apr. 18, 2000) (explaining that the court follows the Second Circuit's rule in *Bridgestone/Firestone, Inc.*, 98 F.3d at 20); *Did-it.com, LLC v. Halo Grp., Inc.*, 102 N.Y.S.3d 687, 688 (App. Div. 2019) (reversing the lower court's dismissal of fraud claim as duplicative where the plaintiff alleged that the defendant made "misrepresentations of present fact that were collateral to the [contract] and further allege[d] that these misrepresentations induced the plaintiff to enter into the [contract]").

### i.   Plaintiff's fraud claim is not duplicative of its breach of contract claim

Defendant asserts that Plaintiff's fraud claim is duplicative of its breach of contract claim because it made no extracontractual misrepresentations to Plaintiff.  In support, Defendant argues that during September and October of 2017, (1) Tevel had reported to Defendant it was working with the shipper[11] to attempt to gather documents necessary for customs clearance, and (2) Defendant therefore relayed all of the information it had to Plaintiff.  (*See* Def.'s 56.1 ¶ 33 ("During September and October 2017, [Defendant] communicated to [Plaintiff] that Tevel had reported to it that it was working with the customer to attempt to gather documents necessary for customs clearance." (citing, *inter alia*, Aug. 2017–Oct. 2017 Email Comm's, annexed to O'Connor Decl. as Ex. J, Docket Entry No. 47-13; Dep. of Boaz Aviani ("Aviani Dep.") at 94–97, annexed to O'Connor Decl. as Ex. F, Docket Entry No. 47-9)).)

Plaintiff argues that (1) Tevel had informed Defendant that the shipper had gone out of business and was unreachable, and (2) Defendant concealed this information from Plaintiff. (Pl.'s 56.1 ¶¶ 30–31, 34.)  In support, Plaintiff points to a communication from Tevel to Defendant on August 30, 2017, where Tevel stated that "Shipper has gone under and is nowhere to be reached."  (Pl.'s 56.1 ¶ 34 (citing Aviani Dep. Exs. at 24–25).)  Plaintiff argues that there is thus a genuine dispute of material fact as to whether Defendant made false statements regarding the reasons for Tevel's delay in retrieving the cargo from the dock.[12]  Construing the facts in

---

[11]   The parties appear to use the words "shipper" and "customer" interchangeably. (Aviani Dep. Exs.)

[12]   In its Reply, Defendant points to emails showing that after sending the emails to Defendant indicating the shipper was unreachable, Tevel informed Defendant that it had made contact with the shipper and was trying to get the requisite information.  (Def.'s Reply 6 (citing Aviani Dep. Exs.))  Regardless of Tevel's later statements that it had been able to contact the shipper, a dispute still exists as to whether the Defendant knew there were issues contacting the

Plaintiff's favor, Plaintiff has demonstrated a fraudulent misrepresentation collateral to the contract, and Plaintiff's fraud claim is therefore not duplicative to its breach of contract claim. *See, e.g.*, *CapLOC, LLC v. McCord*, No. 17-CV-5788, 2020 WL 1036044, at *14 (S.D.N.Y. Mar. 3, 2020) ("A plaintiff may . . . bring parallel fraud and breach of contract claims when there are '[m]isrepresentations of present facts made post-contract formation [that] are collateral or extraneous to the contract.'" (quoting *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 520 (S.D.N.Y. 2016))); *Val Tech Holdings, Inc. v. Wilson Manifolds, Inc.*, 990 N.Y.S. 2d 379, 383 (App. Div. 2014) (allowing both fraud and breach of contract counterclaims where the "defendant[] allege[d] that, after the contract was made, [the] plaintiff repeatedly misrepresented or concealed existing facts concerning [the] plaintiff's performance thereunder," and noting that "[t]he fraud counterclaim thus allege[d] wrongful conduct and injurious consequences independent of those underlying the breach of contract counterclaim").

### ii.   A genuine dispute of material fact exists as to Defendant's intent

There is a genuine dispute of material fact as to whether Defendant had fraudulent intent in allegedly misrepresenting the status of the shipper and the reason for the delay at customs. Defendant asserts that it did not "furnish[] any misrepresentations of any kind" and that Plaintiff has established no motive for Defendant's alleged misrepresentations.  (Def.'s Mem. 6–7.)

Plaintiff disputes this assertion, and points to evidence that Defendant was aware in August of 2017 that the shipper had gone out of business and was unreachable, and that Defendant failed to disclose this fact in order to avoid paying the accruing demurrage and storage charges.  (Pl.'s Opp'n 5–6.)

---

shipper in August of 2017 and that the shipper had gone out of business, but did not relay that information to Plaintiff.

A plaintiff alleging fraud must also establish that the defendant made the false material misrepresentation with the intent to deceive. *See, e.g.*, *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 386 (S.D.N.Y. 2013) ("A fraud claim is not actionable without evidence that the misrepresentations were made with the intent to deceive." (quoting *Friedman v. Anderson*, 803 N.Y.S.2d 514, 517 (App. Div. 2005))).

As discussed, construing the facts in Plaintiff's favor, Plaintiff has demonstrated that Defendant misrepresented the reason for the delay in Tevel's retrieval of the goods from the dock. Despite the later communications from Tevel indicating that it had made contact with the shipper in an attempt to gather the requisite documents to release the cargo from customs, a reasonable jury could nevertheless find that Defendant misrepresented material facts to Plaintiff regarding the reason for the delay getting the cargo released from customs. When combined with the provisions of the Tariff establishing that (1) any abandonment decision was to be made at Plaintiff's discretion and (2) all charges related to abandonment were Defendant's responsibility, a reasonable jury could conclude that Defendant misrepresented the reason for the delay at customs to avoid Plaintiff declaring the cargo abandoned and requiring Defendant to pay for abandonment of the cargo. Plaintiff has sufficiently established intent to defraud sufficient to withstand summary judgment. *See, e.g.*, *Rojas v. Cigna Health & Life Ins. Co.*, No. 14-CV-6368, 2018 WL 4759775, at *9 (S.D.N.Y. Sept. 29, 2018) (noting "the 'strong inference of fraudulent intent' may be shown by evidence of the defendants' 'motive and opportunity to commit fraud' or 'conscious misbehavior or recklessness'" (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006))); *Hernandez v. Money Source Inc.*, No. 17-CV-6919, 2021 WL 1402257, at *11 (E.D.N.Y. Mar. 5, 2021) (same). Moreover, issues of fraudulent intent are generally not resolved at the summary judgment stage. *See, e.g.*, *In re DDAVP Direct Purchaser*

21

*Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) ("We are . . . 'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)); *CapLOC*, 2020 WL 1036044, at *15 ("Issues of motive and intent are usually inappropriate for disposition on summary judgment." (quoting *Wechsler v. Steinberg*, 733 F.2d 1054, 1058–59 (2d Cir. 1984))).

### iii.   A genuine dispute of material fact exists as to whether Defendant's alleged conduct caused Plaintiff's damages

Finally, there is also a genuine dispute of material fact as to the cause of Plaintiff's alleged damages.  Defendant appears to argue that the only potential causal link between Plaintiff's damages and Defendant's alleged conduct are the damages resulting from Defendant's failure to sign a LOA.  (Def.'s Mem. 8–9.)  However, Plaintiff has established a genuine dispute of material fact regarding whether Defendant misrepresented the reason for Tevel's inability to get the goods cleared and retrieve them from customs, which resulted in at least a three-month delay in initiating abandonment procedures, and resulted in at least an additional three months of demurrage and storage fees.  (*See* Pl.'s 56.1 ¶ 35.)  Construing the facts in Plaintiff's favor, Plaintiff has established at a minimum that Defendant's alleged conduct caused Plaintiff's damages.

The Court therefore denies Defendant's motion for summary judgment as to Plaintiff's fraud claim.

### d.   Breach of contract claim

Under New York law,[13] a plaintiff alleging breach of contract must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *DeFlora Lake Dev. Assocs., Inc. v. Park*, 654 F. App'x 9, 10 (2d Cir. 2016) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Milligan v. GEICO Gen. Ins. Co.*, No. 20-CV-3726, 2022 WL 433289, at *2 (2d Cir. Feb. 14, 2022) (same); *Noise In the Attic Prods., Inc. v. London Records*, 782 N.Y.S.2d 1, 3 (App. Div. 2004) (discussing the elements of a breach of contract claim).

---

[13]   Plaintiff contracted with Defendant for a transoceanic shipment of goods from New York to Ashdod, Israel. (Am. Compl. ¶ 19.)  Therefore, the bill of lading at issue is a maritime contract, the interpretation of which is governed by federal maritime law.  *See OOCL (USA) Inc. v. Transco Shipping Corp.*, No. 13-CV-5418, 2015 WL 9460565, at *4 (S.D.N.Y. Dec. 23, 2015) ("Federal courts apply federal common law when interpreting bills of lading for transoceanic shipments like the one here." (citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23 (2004))); *see also In re M/V MSC Flaminia*, 72 F.4th 430, 440 (2d Cir. 2023) (adopting the district court's determination that "the contracts at issue [were] maritime contracts" where they were "contracts for the carriage of goods by sea"); *Herod's Stone Design v. Mediterranean Shipping Co. S.A.*, 846 F. App'x 37, 39 (2d Cir. 2021) ("The [w]aybill is a maritime contract governed by federal maritime law, as its primary purpose was to transport goods by sea from China to California, and then, by amendment, by rail to New York.").

Although "[i]n admiralty cases, federal maritime law applies where it exists," *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993) (first citing *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409–11 (1953); and then citing *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 65 (2d Cir. 1963)), a "[s]tate may modify or supplement the maritime law by creating liability which a court of admiralty will recognize and enforce when the state action is not hostile to the characteristic features of the maritime law or inconsistent with federal legislation," *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 301 n.3 (2d Cir. 2009) (quoting *Just v. Chambers*, 312 U.S. 383, 388 (1941)); *see also CITGO Asphalt Refin. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1088 (2020) ("[F]ederal maritime law includes general principles of contract law." (alteration in original) (quoting 2 T. Schoenbaum, Admiralty & Maritime Law § 11:2, at 7 (6th ed. 2018))); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 546 (1995) ("[A] fundamental feature of admiralty law[ is] that federal admiralty courts sometimes do apply state law." (first citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 451–52 (1994); and then citing 1 S. Friedell, Benedict on Admiralty § 112, at 7–49 (7th ed. 1994))).

"Maritime Contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'" *CITGO Asphalt Refin. Co. v. Frescati Shipping Co.*, 589 U.S. ---, ---, 140 S. Ct. 1081, 1087–88 (2020) (citing *Kirby*, 543 U.S. at 31); *see also Red Hook Container Terminal, LLC v. S. Pac. Shipping Co. Ltd.*, No. 19-0287, 2021 WL 5492964, at *1 (2d Cir. 2021) (same); *Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics, Inc.*, No. 17-CV-7495, 2023 WL 5164211, at *10 (S.D.N.Y. Aug. 11, 2023) (same). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *CITGO*, 140 S. Ct. at 1088 (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). When a written contract is ambiguous, however, "its meaning is a question of fact, requiring a determination of the intent of [the] parties in entering the contract; that may involve examining relevant extrinsic evidence of the parties' intent and the meaning of the words they used." *Id.* (alteration in original) (internal quotations omitted).

### i.  Plaintiff's performance under the contract

Defendant first argues that the Court should dismiss Plaintiff's breach of contract claim because Plaintiff failed to perform its own obligations under the contract by (1) not providing its own LOA to Zim and (2) failing to provide a "formal" abandonment invoice showing fees actually paid to Zim, rather than intermittent email invoices showing the fees Zim was asserting were owed. (Def.'s Mem. 14–15.) In support of its argument, Defendant points to the Tariff, which states that (1) the Plaintiff "may dispose of . . . any unclaimed/abandoned freight at its sole discretion," and (2) if abandonment occurs, "[a]ll charges will be presented in the form of an abandonment invoice to the booking party (Shipper)." (*See* Def.'s Mem. 15; Tariff 1.)

Plaintiff argues that it complied with the contract because (1) Zim required a LOA from Defendant directly and Plaintiff was not required under the bill of lading or the Tariff to provide a LOA, and (2) it provided Defendant with invoices of the fees Zim was charging.  (Pl.'s Opp'n 9–10.)

Defendant has not shown that Plaintiff failed to perform under the contract.  Despite Defendant's assertions, there is nothing in the bill of lading or the Tariff, and Defendant has not pointed to anything, that could be interpreted as requiring Plaintiff to provide its own LOA, or as prohibiting Plaintiff from requesting one from Defendant as part of the abandonment process.  Defendant similarly does not point to any provision in the bill of lading that required Plaintiff to have pre-paid fees related to abandonment or provide a "final" abandonment invoice showing it had done so.  Defendant has thus failed to establish that Plaintiff breached any specific provision of the parties' contract.  *Cf. Franklin Techs., Inc. v. Encite Inc.*, No. 16-CV-1603, 2019 WL 13236720, at *6 (E.D.N.Y. Mar. 28, 2019) (granting summary judgment and dismissing a breach of contract claim where the plaintiff "failed to demonstrate that a specific provision of any contract was breached"); *Gianelli v. RE/MAX of New York, Inc.*, 41 N.Y.S.3d 273, 274 (App. Div. 2016) ("A breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached.").

### ii.   Defendant's performance under the contract

Defendant also argues that it did not breach the contract because (1) Defendant was only required to pay the charges listed in a final abandonment invoice, and (2) the invoices provided by Plaintiff sought payment of charges that were never actually incurred, and therefore were not final abandonment invoices.  Defendant therefore argues that in the event the Court dismisses the breach of contract claim, the Court should limit Plaintiff's damages claim to the actual amounts

paid, which total $28,689.45.[14]  (Def.'s Mem. 15–17).  In support of its argument, Defendant

cites language in the Tariff stating that if abandonment occurs, "[a]ll charges will be presented in

the form of an abandonment invoice to the booking party (Shipper)," as well as the provision that

"[a]ny and all charges that are incurred are the responsibility of [Defendant] which includes any

and all charges related to abandonment."  (Tariff 1.)  Defendant primarily argues that Plaintiff

was required to "incur" the charges to establish Defendant's liability for them, which Defendant

argues only occurred when Plaintiff actually paid those charges.  (*See, e.g.*, Def.'s Mem. 15–17

(arguing that the charges laid out in the Amended Complaint were "fabricated" because "CLI

only paid a grand total of $28,689.45" once the charges were negotiated down in 2019); *id.* at 17

(stating that the invoice provided to Defendant "contained a multitude of false statements,

including that [Plaintiff] had actually incurred storage and demurrage fees that were never paid

to anyone").)

Plaintiff argues that it provided Defendant with Zim's ongoing invoices of accruing

demurrage and storage charges and Plaintiff's damages are therefore the invoiced amounts, and

Defendant cannot now argue that it should be responsible only for the proposed settlement of

$25,000 it previously rejected.  (Pl.'s Opp'n 9–10.)

To "incur" is defined as "[t]o suffer or bring on oneself (a liability or expense)."  *Incur*,

Black's Law Dictionary (11th ed. 2019).  "Liability" in turn is defined as "[t]he quality, state, or

---

[14]   Defendant also argues that Plaintiff's allegations regarding what it claims occurred before the Federal Maritime Commission ("FMC") in confidential mediation are inadmissible in this proceeding.  (Def.'s Mem. 14.)  Plaintiff argues that Defendant cannot claim Plaintiff's allegations regarding what occurred before the FMC must be inadmissible while simultaneously arguing that Plaintiff's contractual damages should be limited to the $25,000 amount negotiated in the FMC proceedings.  (Pl.'s Opp'n 9.)  Because the Court does not consider the outcome of the FMC proceedings in its analysis of Plaintiff's breach of contract claim, it declines to resolve what, if any, information from the FMC proceedings would be admissible before the Court.

condition of being legally obligated or accountable; legal responsibility to another or to society,

enforceable by civil remedy or criminal punishment" or in the alternative, "[a] financial or

pecuniary obligation in a specified amount; debt." *Liability*, Black's Law Dictionary (11th ed.

2019).

Plaintiff incurred the fees at a minimum once it became legally obligated to Zim to pay

them. *See, e.g.*, *Liberty Mutual Fire Ins. Co. v. JDS Constr. Grp. LLC*, No. 21-CV-1931, 2023

WL 6143559, at *9 (S.D.N.Y. Sept. 20, 2023) (concluding that the definition of "incur"

"suggests more than merely an estimate, but some knowledge about the claim . . . such that . . .

[d]efendants [are] 'subject to' that loss" and that "it does not follow from the definition of 'incur'

that losses must be established with some level of finality, or that [d]efendants must be

definitively liable for that loss — otherwise the definition would not also encompass being

'subject to' in addition to being 'liable' for a loss" (quotations omitted)).[15]

Defendant does not dispute that Plaintiff sent it ongoing invoices of the fees being

charged by Zim during the period when Defendant refused to provide an LOA, nor does

Defendant dispute that it has not paid Plaintiff for any of the storage, demurrage, or disposal

costs. (Def.'s 56.1 ¶¶ 58–59.)  The Tariff states that the "abandonment invoice is payable

immediately," and that "[i]f [the] abandonment invoice is not paid within [five] business days of

receipt then a 33% surcharge will be added."  (Tariff 1.)  Construing the facts in Plaintiff's favor,

Defendant failed to perform its obligation under the parties' contract when it did not pay the

invoiced amounts.

---

[15]  Even assuming the word "incurred" as used here is ambiguous, under *CITGO*, 140 S.
Ct. at 1088, where a term is ambiguous "its meaning is a question of fact" to be decided by a
jury, which would preclude summary judgment.

Based on the evidence that Plaintiff provided ongoing invoices to Defendant, Plaintiff has, at a minimum, created a genuine dispute of material fact as to whether Defendant failed to comply with the parties' contract when it refused to pay the amounts requested in the provided invoices by the requisite deadlines.  (*See, e.g.*, Nov. 30, 2017 Invoices, annexed to Am. Compl. as Ex. R, Docket Entry No. 14-18; Tariff at 1); *see also Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 282 (2d Cir. 1986) (concluding that the parties' contract, which provided for payment "without discount on delivery" required payment of a "freight bill promptly upon delivery . . . [without] asserting a claim in abatement or set-off"); *Maersk Line A/S v. Carew*, 588 F. Supp. 3d 493, 506 (S.D.N.Y. 2022) (concluding that a contract term stating that the defendant was required to "pay [the plaintiff] amounts required under the [contract] upon receipt of an invoice without further documentation" established that "after receiving an invoice, [the defendant] had to pay [the plaintiff] before she could dispute any charges" (internal quotation omitted));  *Invoice*, Black's Law Dictionary (11th ed. 2019) (defining an invoice as "[a]n itemized list of goods or services furnished by a seller to a buyer, usu[ally] specifying the price and terms of sale; a bill of costs").

The Court therefore denies Defendant's motion for summary judgment as to Plaintiff's breach of contract claim.[16]

---

[16]  Although the invoices establish a genuine dispute of material fact sufficient to preclude summary judgment, any final damages award will still be constrained to Plaintiff's allowable actual and consequential damages.  *See, e.g.*, *Merrill Lynch*, 500 F.3d at 185 (noting that under New York law, "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms" (citing *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006))).

### e.    Lost profits

Defendant argues that the Court should grant summary judgment on Plaintiff's claim for lost profits.  (Def.'s Mem. 9.)  In support, it argues that there is no evidence that Zim ever foreclosed Plaintiff from any shipments.  (*Id.*)  Defendant also argues that Plaintiff is not entitled to consequential or exemplary damages because the lost profits Plaintiff are seeking are "purely hypothetical" where (1) the Amended Complaint does not include any examples of business lost or a comparison of Zim's rates against other shipping lines; (2) Plaintiff's export division is in effect a startup business, for which lost profit calculations are generally unreliable; and, (3) Plaintiff cannot show that lost profit damages were in the contemplation of the parties when the contract was made.  (*Id.* at 10–14.)  Finally, Defendant argues that Plaintiff has not shown Defendant's alleged breach caused Plaintiff's alleged lost profits, because Plaintiff's Tariff set up an explicit procedure for Plaintiff to follow to avoid the lost profits it claims have occurred.  (*Id.* at 14.)

Plaintiff argues that the evidence establishes that Plaintiff's loss of customers was because of the loss of Zim, and as a result, Plaintiff's export division never recovered from the loss of Zim, resulting in lost profits in excess of $250,000.  (Pl.'s Opp'n 7–8.)  Plaintiff also argues that its lost profits were foreseeable because Defendants, as sophisticated shipping professionals, knew that the consequence of abandoning cargo would be the loss of shipping rights with Zim.  (*Id.*)  Finally, Plaintiff argues that Defendant's conduct proximately caused the alleged damages because Defendant created the circumstances resulting in a large amount of demurrage and storage and then refused to issue a letter of abandonment unless those costs were reduced, resulting in "further and more extensive damage" to Plaintiff.  (*Id.* 8–9.)

Maritime law allows for the recovery of consequential damages, including lost profits, if such damages are "a foreseeable result of the breach." *See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 874 (1986) (explaining that "[t]he limitation [on liability] in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach" (citing *Hadley v. Baxendale* (1854) 156 Eng. Rep. 145)). "In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). Whether alleged lost profits were foreseeable and within the contemplation of the parties is a question of fact. *See, e.g.*, *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) ("[D]etermining the parties' original contemplation . . . can often raise knotty questions of fact[.]"); *Marine Steel Transport Line, LLC v. E. Metal Recycling, LLC*, No. 19-CV-2275, 2023 WL 3603489, at *2 (E.D.N.Y. May 23, 2023) (first citing *Martin v. Metro. Prop. & Cas. Ins. Co.*, 656 N.Y.2d 318, 319 (App. Div. 1997); and then citing *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001)); *DistributorsOutlet.com, LLC v. Glasstree, Inc.*, No. 11-CV-6079, 2016 WL 1273229, at *11 (E.D.N.Y. Mar. 31, 2016) ("Whether liability for lost profits was 'fairly within the contemplation of the parties' at the time the agreement was formed is a question of fact[.]").

Where the contract is silent on the subject of consequential damages, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously." *Schonfeld*, 218

F.3d at 172 (quoting *Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 319 (1989)); *see also E. Coast Resources, LLC v. Town of Hempstead*, 707 F. Supp. 2d 401, 411 (E.D.N.Y. 2010) (same).

There is a genuine dispute of material fact as to whether the parties reasonably contemplated that the consequence for a breach of the parties' contract would result in the loss of shipping rights with Zim.  Plaintiff has pointed to evidence that Defendant is a licensed NVOCC and has been in the international shipping business since 2010, and Aviani has been working in the shipping industry since 1986.  (Pl.'s Mem. 7–8; Aviani Dep. 6:13–15, 8:17–23, 16:13–25.) Plaintiff has also pointed to evidence that Zim was a "preferred carrier in a lot of [shipping] lanes."  (Pl.'s 56.1 ¶¶ 73, 76.)  Plaintiff's evidence of Defendant's status as a sophisticated and experienced shipping company and the general industry knowledge that Zim was a preferred carrier, as well as Defendant's knowledge of Plaintiff's relationship with Zim, given that it was the carrier used for Defendant's shipping, although limited, is sufficient to preclude a finding as a matter of law and creates a factual dispute precluding the dismissal of Plaintiff's lost profits claim at this stage of the proceeding.  *See, e.g.*, *Marine Steel*, 2023 WL 3603489, at *2–3 (denying motion for summary judgment on plaintiff's lost profits claim because "whether lost profits were reasonably foreseeable and contemplated by the parties at the time of their agreement" was "a question of fact" (citing *Bluebonnet Sav. Bank*, 266 F.3d at 1355)); *cf. Omega Engineering, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1093 (D. Conn. 1995) (concluding there was a genuine issue as to whether the movant had reason to foresee the plaintiff would lose profits due to a product defect and denying summary judgment where the movant "cite[d] no evidence to support its claim that a chain of events connecting" the defendant's product defects to plaintiff's profit loss "was not reasonably foreseeable at the time the alleged warranties were made").

Plaintiff also points to deposition testimony from Kemp (1) that Plaintiff could not book cargos with Zim beginning in November 2017 as a result of Defendant's shipment, and (2) naming specific customers that refused to ship with Plaintiff once Plaintiff's relationship with Zim deteriorated, because they required Zim to be used as a carrier.  (Pl.'s 56.1 ¶¶ 73, 76, 79–82.)  In addition, Plaintiff provided evidence of its profits in the years prior to Zim refusing to book shipments with Plaintiff, broken down by client.  (Rundle Damages Calculations.)  Plaintiff has thus established a genuine dispute of material fact as to whether the deterioration of its relationship with Zim was proximately caused by Defendant's breach of contract and the resultant delay in abandonment procedures, and whether potential lost profits could be established with reasonable certainty.  *See, e.g.*, *Merlit Indus, Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir. 1993) (concluding that the plaintiff's lost profits claim should have been presented to the jury because the plaintiff, "an established business, offered statistical evidence of its past performance" (citing *Greasy Spoon Inc. v. Jefferson Towers, Inc.*, 75 N.Y.2d 795–96 (1990))); *cf. Washington v. Kellwood Co.*, 714 F. App'x 35, 41 (2d Cir. 2017) (noting that lost profits damages "need not be proven with mathematical precision, [but] must be capable of measurement based upon known reliable factors without undue speculation" and that "[a] new venture whose profits are 'purely hypothetical' and that would require 'untested' sales to 'hypothetical' customers does not support a damages award" (quoting *Schonfeld*, 218 F.3d at 173)).

The Court therefore denies Defendant's motion for summary judgment as to Plaintiff's lost profits.

### III.   Conclusion

For the reasons stated above, the Court denies Defendant's (1) motion to exclude Kemp's

and Rundle's expert opinion testimonies and (2) motion for summary judgment.

Dated:  March 18, 2024
        Brooklyn, New York

                              SO ORDERED:


                              _____  s/ MKB  _____
                              MARGO K. BRODIE
                              United States District Judge

33